UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

| | |
|---|---|
| INVISTA North America S.à.r.l., a Delaware Corporation<br>23, Val Fleuri, L-1526,<br>Luxembourg,<br>Grand Duchy of Luxembourg,<br><br>                    Plaintiff,<br><br>v.<br><br>Rhodia Polyamide Intermediates S.A.S., a French Corporation,<br><br>                    Defendant. | Civil Case No.<br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff INVISTA North America S.à.r.l. ("INVISTA"), for its complaint against

Defendant Rhodia Polyamide Intermediates S.A.S. ("Rhodia PI") by and through its attorneys,

alleges as follows:

## I.    NATURE OF THIS ACTION

1.    This is a civil action pursuant to 35 U.S.C. § 256 to correct inventorship of U.S.

Patent No. 7,084,293 (the "'293 Patent"), a true and correct copy of which is attached hereto as

Exhibit A. The '293 Patent, which issued on August 1, 2006, is entitled "Process of Synthesis of

Compounds Having Nitrile Functions from Ethylenically Unsaturated Compounds." The '293

Patent is directed to a chemical process in which ethylenically unsaturated organic compounds

are converted, through the process of hydrocyanation, into compounds having at least one nitrile

function. The hydrocyanation is carried out in the presence of a catalytic system comprising a

metallic element and mono- and pluridentate organophosphorus ligands. The compounds resulting from this process are useful intermediates in the development of products such as nylon fiber.

2.    This action is necessary because the '293 Patent fails to name as inventors the scientists employed by E.I. DuPont de Nemours & Co. ("DuPont") who conceived and reduced to practice the invention claimed therein, including at least Dr. Ronald J. McKinney, Dr. Scott C. Jackson, and Dr. Thomas Foo. These individuals were actually responsible for conceiving and developing the invention disclosed and claimed in the '293 Patent. During the period beginning in the late 1990s and continuing into the early 2000s, these and other DuPont scientists made confidential technical disclosures to employees of various Rhodia entities, including Rhodia PI, relating to DuPont's improved technology, known as the Gen 3 Process, for the production of adiponitrile ("ADN"), an intermediate used in the manufacture of nylon fiber. These disclosures were made in the course of a project to implement the Gen 3 Process technology at a plant in Chalampé, France, which is run jointly by DuPont, now INVISTA[1], and Rhodia.

3.    The Gen 3 Process technology disclosed to Rhodia included a hydrocyanation process using a catalyst composed of a mixture of bidentate and monodentate ligands. After learning about the use of this novel catalytic mixture and its advantages over the prior technology, Rhodia ultimately refused to implement the Gen 3 Process technology at the plant in Butachimie, asserting that there were various problems with the proposed implementation. In the meantime, unbeknownst to INVISTA, Rhodia employees misappropriated the Gen 3 Process

---

[1] In 2003, subsidiaries of Koch Industries, Inc. acquired assets of INVISTA from DuPont Textiles & Interiors, a wholly- owned subsidiary of DuPont. INVISTA is the owner of the inventions described in this Complaint.

technology and included it in patent applications filed by Rhodia, falsely naming employees of Rhodia PI as the inventors.

4.    The '293 Patent names three individuals affiliated with Rhodia PI as the patent's inventors. However, the invention disclosed and claimed in the '293 Patent was in fact made by at least the above-named DuPont scientists. Rhodia PI used this misappropriated information to file US Patent Application 10/353,912, with a priority date of December 23, 2002, which matured into the '293 Patent. Because the inventive subject matter disclosed and claimed in the '293 Patent was conceived and reduced to practice by employees at INVISTA and DuPont, they should be named as inventors of the '293 Patent. In addition, because the Rhodia PI individuals named as inventors of the '293 Patent did not invent the subject matter disclosed and claimed therein, they should be removed as named inventors of the '293 Patent.

5.    INVISTA is the true owner of the '293 Patent and therefore has a strong interest in correcting the inventorship. Accordingly, INVISTA seeks a judgment of this Court correcting the inventorship of the '293 Patent.

6.    Furthermore, through this complaint, INVISTA seeks to enjoin Rhodia PI and those in active concert with it from including any of INVISTA's proprietary and confidential information in any other patent applications and to declare a constructive trust in favor of INVISTA over the '293 Patent and all other patent applications filed by Rhodia PI that contain INVISTA's proprietary and confidential information. Further, INVISTA seeks redress for Rhodia PI's misappropriation of INVISTA's trade secrets and Rhodia PI's slander of title to INVISTA's ownership rights to the '293 Patent and other related patent applications as set forth below.

## II.    THE PARTIES

7.    Plaintiff INVISTA (formerly DuPont Textiles & Interiors) is a corporation organized under the laws of Delaware, having its principal place of business at 23, Val Fleuri, L-1526, Luxembourg, Grand Duchy of Luxembourg.  INVISTA is one of the world's largest integrated fibers and polymers businesses and is a wholly-owned and indirect subsidiary of Koch Industries, Inc.

8.    Defendant Rhodia PI is a corporation organized under the laws of France, having its principal place of business at 267 Chalampé, 68055 Mulhouse, France.  Rhodia PI is a wholly-owned subsidiary of Rhodianyl SNC.

## III.    JURISDICTION AND VENUE

9.    This action arises under the Patent Laws of the United States, 35 U.S.C. § 1 *et. seq.,* and the laws of the Commonwealth of Virginia.  Accordingly, this Court has jurisdiction over the subject matter of the action pursuant to 28 U.S.C. §§ 1331, 1338(a) and 1367; 35 U.S.C. § 256; and the doctrines of ancillary and pendent jurisdiction.  Rhodia PI has transacted business in Virginia by filing and prosecuting patent applications at the United States Patent and Trademark Office ("USPTO").  The USPTO, where the disputed patent applications were filed, has facilities in Alexandria, Virginia and Arlington, Virginia.

10.    This Court has personal jurisdiction over Rhodia PI pursuant to 35 U.S.C. § 293 because this dispute involves an action respecting a patent or rights thereunder.

11.    Venue is proper in this District pursuant to 35 U.S.C. § 293 and 28 U.S.C. §§ 1391(c) and 1391(d) because alien corporation Rhodia PI is subject to personal jurisdiction in this district.

## IV.    FACTUAL ALLEGATIONS

## THE DEVELOPMENT OF THE RELEVANT TECHNOLOGY

12.    In 1974, INVISTA's predecessor, DuPont, entered into a venture with Rhone-Poulenc S.A., a predecessor in interest to Rhodia S.A. ("Rhodia"), the ultimate parent of Rhodia PI, by which DuPont and Rhodia set up a company called Butachimie, to construct and operate a plant for the production of ADN in France. The Butachimie plant, located in Chalampé, France, has been in operation since 1978, using a chemical process for the production of ADN. This process is referred to as the Gen 1 Process.

13.    On or about March 2, 1998, INVISTA's predecessor, DuPont, and Butachimie entered into a license agreement whereby DuPont granted to Butachimie a nonexclusive, nonassignable, and nontransferable license to certain of DuPont's, now INVISTA's, patents, patent applications, technical information and know-how relating to an improved hydrocyanation process for the manufacture of ADN using a mixture of bidentate and monodentate ligand catalysts. The licensed technology is referred to as the Gen 3 Process. An important difference between the Gen 1 and Gen 3 Processes is that the Gen 1 Process uses only monodentate ligand catalysts, while the Gen 3 Process improves the catalytic system by utilizing a mixture of a bidentate ligand known as Diphite 5 ("D5") and monodentate ligands. The Gen 3 Process, including the use of a catalytic mixture of D5 and monodentate ligands, was developed solely by employees of DuPont, now INVISTA. The 1998 license agreement granted to Butachimie the

5

right to implement and use the Gen 3 Process to manufacture ADN at the plant in Chalampé, France.

14.    Pursuant to the March 2, 1998 license agreement, INVISTA disclosed confidential information concerning the Gen 3 Process, including the use of a catalytic mixture of D5 bidentate and monodentate ligands, to employees of Rhodia, who were working at or in connection with the Butachimie ADN plant.  These disclosures began in the late 1990s and continued through the early 2000s.  The purpose of these disclosures was to permit the Rhodia employees operating the Butachimie ADN plant to validate and implement the Gen 3 Process.

15.    As part of the confidential disclosures of the Gen 3 Process, during the period January 17-21, 2000, several DuPont employees led by Dr. McKinney gave a presentation in France concerning the Gen 3 Process (hereinafter the "McKinney Presentation") to employees of Rhodia.  The McKinney Presentation was a culmination of work performed by DuPont employees including Drs. McKinney, Jackson and Foo.  The presentation described the Gen 3 Process, including the use of a catalytic system containing a mixture of D5 bidentate and monodentate ligands.  It further explained the basis of the selection of D5 as the appropriate bidentate ligand, the process for the production of D5, and the resistance of D5 to hydrolysis as compared with monodentate ligands.

16.    Also as part of the confidential disclosures of the Gen 3 Process, during the period January 17-21, 2000, Dr. Jackson of DuPont led a presentation in France concerning the Gen 3 Process (hereinafter the "Jackson Presentation") to an audience including Rhodia employees. The Jackson presentation focused on management of the Gen 3 catalyst.  It disclosed technical

information relating to the stability and solubility of the Gen 3 catalyst, including the fact that catalyst solubility increases with CBP.

17.    Among other things, Rhodia required DuPont validate the Gen 3 Process technology provided pursuant to the license. This requirement of validation was a key reason for a significant portion of the confidential Gen 3 Process disclosures made by DuPont to Rhodia. As part of this validation requirement, during the course of these confidential disclosures, employees of Rhodia submitted to INVISTA a series of over 260 questions relating to the Gen 3 Process and specifics of the implementation thereof. INVISTA worked diligently to provide detailed answers to those questions over several months, having revised and completed their answers to Rhodia in or about December of 2000.

18.    Yan LeMaitre, the Butachimie representative who spearheaded the inquiry to INVISTA regarding the Gen 3 Process, is and was in 2000 an employee of Rhodia PI. LeMaitre as well as other Rhodia employees received from INVISTA confidential information regarding the Gen 3 Process that was misappropriated for the benefit of Rhodia PI.

19.    Other disclosures of confidential information concerning the Gen 3 Process also were made by DuPont employees to Rhodia during the late 1990s to early 2000s time frame. Ultimately, the Gen 3 Process was not implemented in the Butachimie plant due to objections raised by Rhodia.

20.    On December 23, 2002, Rhodia PI filed a patent application in France (Application No. 02/16550). A counterpart application, claiming priority based on the French application, was filed in the U.S. on January 30, 2003; was published in the U.S. on June 24,

2004; and issued as the '293 Patent on August 1, 2006. Rhodia PI is the assignee of the '293

Patent, which names Cecile Rosier, Philippe Marion and Damien Bourgeois as inventors.

21.    The invention disclosed and claimed in the '293 Patent involves an improved way

of manufacturing ADN through the use of a catalytic system utilizing a mixture of pluridentate

and monodentate ligands. This technology is, in fact, the invention of the above-named DuPont

scientists. As such, the '293 Patent includes in its specification and claims confidential

information concerning the Gen 3 Process that was developed by employees of INVISTA and

not the inventors named in the '293 Patent.

22.    Specifically, the '293 Patent discloses the use of a catalytic mixture composed of

pluridentate and monodentate ligands. It further identifies D5 as a suitable and, indeed, preferred

bidentate ligand to be used in the catalytic mixture and discusses the resistance of pluridentate

ligands such as D5 to hydrolysis. All of this information was supplied confidentially by

INVISTA to Rhodia as part of the disclosures of the Gen 3 Process and is not an invention of the

Rhodia inventors named in the '293 Patent.

23.    Accordingly, INVISTA is entitled, under 35 U.S.C. § 256, to a correction of

inventorship. Specifically, it is entitled to add as inventors at least DuPont employees Ronald J.

McKinney, Scott C. Jackson, and Thomas Foo, who conceived the Gen 3 Process technology

improperly included in the '293 Patent, and to remove the currently named inventors, since they

did not conceive the invention.

## OTHER PENDING RHODIA PATENT APPLICATIONS CONTAINING INVISTA CONFIDENTIAL INFORMATION

24.    Rhodia PI has also filed other patent applications containing confidential information supplied by DuPont employees as part of the confidential Gen 3 Process disclosures.

25.    Rhodia PI prepared and prosecuted each of the below-listed patent applications, as well as the '293 Patent, without the knowledge of the true inventors.

## THE '955 APPLICATION

26.    Rhodia PI is the owner of a patent application numbered US 2006/0252955 (the "'955 application"), with a priority date of December 23, 2002. The '955 application is entitled "Process of Synthesis of Compounds Having Nitrile Functions From Ethylenically Unsaturated Compounds" and relates to a process of hydrocyanation of diolefins. The '955 application is a divisional application claiming priority to the same application which resulted in the '293 Patent.

27.    As with the '293 Patent, the '955 application includes confidential information developed by DuPont and INVISTA employees regarding the Gen 3 Process, specifically, a catalytic system comprising a mixture of monodentate and bidentate ligands and selection of the D5 ligand for the process.

## THE '498 APPLICATION

28.    Rhodia PI is the owner of a patent application numbered WO 2004/101498 (the "'498 application"), with a priority date of May 12, 2003. The '498 application is entitled "Process for Hydrocyanation of Unsaturated Compounds" and relates to a process for hydrocyanation of unsaturated compounds.

9

29.    The '498 application includes confidential information developed by DuPont and INVISTA employees regarding the Gen 3 Process, specifically, a catalytic system comprising a mixture of monodentate and bidentate ligands and selection of the D5 ligand for the process.

## THE '497 APPLICATION

30.    Rhodia PI is the owner of a patent application numbered WO 2004/101497 (the "'497 application"), with a priority date of May 12, 2003.  The '497 application is entitled "Process of Preparing Dinitriles" and relates to a process of preparing dinitriles by hydrocyanation of unsaturated nitriles.

31.    The '497 application includes confidential information developed by DuPont and INVISTA employees regarding the Gen 3 Process, specifically, a catalytic system comprising a mixture of monodentate and bidentate ligands and selection of the D5 ligand for the process.

## THE '924 APPLICATION

32.    Rhodia PI is the owner of a patent application numbered WO 2004/080924 (the "'924 application"), with a priority date of February 10, 2003.  The '924 application is entitled "Method of Producing Dinitrile Compounds" and relates to a method of producing compounds containing two nitrile functions.

33.    The '924 application includes confidential information developed by DuPont and INVISTA employees regarding the Gen 3 Process, specifically, a catalytic system comprising a mixture of monodentate and bidentate ligands and selection of the D5 ligand for the process.

## FIRST CLAIM FOR RELIEF

## ADDITION OF INVENTORS PURSUANT TO 35 U.S.C. § 256

34.    INVISTA incorporates by reference paragraphs 1 through 33 as though fully set forth herein.

35.    At least the following DuPont employees were the first persons to conceive and reduce to practice the subject matter claimed in the '293 Patent: Dr. Ronald J. McKinney, Dr. Scott C. Jackson, and Dr. Thomas Foo.

36.    These DuPont employees developed the invention on behalf of DuPont, now INVISTA, and are accordingly the true inventors of the inventions disclosed and claimed in the '293 Patent.

37.    Pursuant to 35 U.S.C. § 256, each of the foregoing persons should be added as inventors on the '293 Patent.

38.    The failure to name these persons as inventors on the '293 Patent occurred without any deceptive intent on their part.

## SECOND CLAIM FOR RELIEF

## REMOVAL OF IMPROPERLY NAMED INVENTORS PURSUANT TO 35 U.S.C. § 256

39.    INVISTA incorporates by reference paragraphs 1 through 38 as though fully set forth herein.

40.    Pursuant to 35 U.S.C. § 256, Cecile Rosier, Philippe Marion, and Damien Bourgeois should be removed as inventors on the '293 Patent since they did not conceive the invention disclosed and claimed in the '293 Patent.

### THIRD CLAIM FOR RELIEF

### UNJUST ENRICHMENT UNDER VIRGINIA LAW

41.    INVISTA incorporates by reference paragraphs 1 through 40 as though fully set forth herein.

42.    Rhodia PI has retained the benefit of INVISTA's confidential information through its prosecution of the application leading to U.S. Pat. No. 7,084,293; US 2006/0252955; WO 2004/101498; WO 2004/101497; and WO 2004/080924.

43.    The actions of Rhodia PI set forth above constitute an action for unjust enrichment under Virginia law.

44.    By reason of the foregoing, INVISTA is entitled to appropriate equitable relief, including but not limited to assignment, as well as an injunction preventing Rhodia PI from asserting any rights it maintains under any patents or patent applications including, without limitation, reexaminations, continuations, continuations-in-part, divisionals, foreign counterpart patents, and foreign counterpart patent applications, containing INVISTA's confidential information.  These patents and patent applications specifically include U.S. Pat. No. 7,084,293; US 2006/0252955; WO 2004/101498; WO 2004/101497; and WO 2004/080924.

## FOURTH CLAIM FOR RELIEF

## CONSTRUCTIVE TRUST UNDER VIRGINIA LAW

45.    INVISTA incorporates by reference paragraphs 1 through 44 as though fully set forth herein.

46.    The actions of Rhodia PI set forth above constitute an action for a constructive trust under Virginia law.

47.    By reason of the foregoing, any and all related and future patents and patent applications, whether published or non-published, including, without limitation, reexaminations, continuations, continuations-in-part, divisionals, foreign counterpart patents, and foreign counterpart patent applications, that contain INVISTA confidential information, as well as any profits received by Rhodia PI in connection with the use of INVISTA's confidential information, should be placed in a constructive trust for the benefit of INVISTA. These patents and patent applications specifically include U.S. Pat. No. 7,084,293; US 2006/0252955; WO 2004/101498; WO 2004/101497; and WO 2004/080924.

## FIFTH CLAIM FOR RELIEF

## MISAPPROPRIATION OF TRADE SECRETS UNDER VIRGINIA LAW

48.    INVISTA incorporates by reference paragraphs 1 through 47 as though fully set forth herein.

49.    The actions of Rhodia PI set forth above constitute an action for the misappropriation of trade secrets under Virginia law.

13

50.    Rhodia PI's misappropriation of INVISTA's trade secrets was willful and malicious, thereby entitling INVISTA to exemplary damages pursuant to Virginia law and reasonable attorney's fees pursuant to Virginia law.

## SIXTH CLAIM FOR RELIEF

## SLANDER OF TITLE UNDER VIRGINIA LAW

51.    INVISTA incorporates by reference paragraphs 1 through 50 as though fully set forth herein.

52.    Rhodia PI improperly registered its claim to the '293 Patent and other patent applications with knowledge that title to this intellectual property remains with INVISTA. Accordingly, during these registrations, Rhodia PI made false statements regarding the ownership of U.S. Pat. No. 7,084,293; US 2006/0252955; WO 2004/101498; WO 2004/101497; and WO 2004/080924.

53.    Rhodia PI's slander of INVISTA's title has resulted in special damages including, *inter alia*, INVISTA's costs and fees in preparing and filing declarations to correct Rhodia PI's erroneous registrations claiming ownership of INVISTA's property and in the prosecution of this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

54.    As to the First and Second Claims for Relief, that the Court (a) order the addition of Dr. Ronald J. McKinney, Dr. Scott C. Jackson, and Dr. Thomas Foo as inventors of the '293

14

Patent, and (b) order the removal of Cecile Rosier, Philippe Marion, and Damien Bourgeois as inventors of the '293 Patent.

55.    As to the Third Claim for Relief, that the Court grant appropriate equitable relief, including but not limited to assignment, and permanently enjoin Rhodia PI, its parents, subsidiaries, divisions, affiliates, officers, directors, agents, successors and assigns from asserting any rights it maintains under any patent applications, published or non-published, including without limitation the families of applications related to: U.S. Pat. No. 7,084,293; US 2006/0252955; WO 2004/101498; WO 2004/101497; and WO 2004/080924, including reexaminations, continuations, continuations-in-part, divisionals, foreign counterpart patents, and foreign counterpart patent applications, containing INVISTA's confidential information.

56.    As to the Fourth Claim for Relief, that the Court require Rhodia PI to hold in constructive trust for the benefit of INVISTA the '293 Patent and any and all related or future patents and patent applications, whether published or non-published, that contain INVISTA confidential information, including without limitation the families of applications related to: U.S. Pat. No. 7,084,293; US 2006/0252955; WO 2004/101498; WO 2004/101497; and WO 2004/080924, including reexaminations, continuations, continuations-in-part, divisionals, foreign counterpart patents, and foreign counterpart patent applications, and any profits or interests received by Rhodia PI in connection with the use of INVISTA's confidential information.

57.    As to the Fifth Claim for Relief, that pursuant to Virginia law, the Court (a) permanently enjoin Rhodia PI, its parents, subsidiaries, divisions, affiliates, officers, directors, agents, successors and assigns from any use of confidential trade secrets obtained in connection with the use of INVISTA's confidential information, including without limitation use in any

prospective patent application, either published or non-published; and (b) award to INVISTA damages related to Rhodia PI's misappropriation of trade secrets, and that such damages be doubled for willful and malicious appropriation pursuant to Virginia law.

58.    As to the Sixth Claim for Relief, that the Court award INVISTA special damages including, *inter alia*, INVISTA's costs and fees.

59.    That the Court award INVISTA reasonable attorney's fees and costs in this suit as a result of (a) the Court's own determination that such an award is necessary; (b) pursuant to 35 U.S.C. § 285; and/or (c) pursuant to Virginia law.

## JURY DEMAND

Pursuant to F.R.C.P. 38, Plaintiff INVISTA North America S.à.r.l. respectfully

demands a trial by jury of any and all issues properly triable to a jury in the above-captioned

action.


Dated: December 22, 2006

LATHAM & WATKINS LLP

_Abid R. Qurshi_

Abid R. Qureshi (DC Bar No. 459227)
555 Eleventh Street, NW
Suite 1000
Washington, DC  20004
Telephone:  (202) 637-2200
Facsimile:  (202) 637-2201
Attorney for the Plaintiff

Of Counsel:
Robert J. Gunther, Jr.
James P. Barabas
885 Third Avenue, Suite 1000
New York, New York  10022
Telephone: (212) 906-1200
Facsimile:  (212) 751-4864

US007084293B2

EXHIBIT A

(12) **United States Patent**　　　　　　　(10) **Patent No.:**　**US 7,084,293 B2**
Rosier et al.　　　　　　　　　　　　　　(45) **Date of Patent:**　　　**Aug. 1, 2006**

(54) **PROCESS OF SYNTHESIS OF COMPOUNDS HAVING NITRILE FUNCTIONS FROM ETHYLENICALLY UNSATURATED COMPOUNDS**

(75) Inventors: **Cécile Rosier**, Soucieu en Jarrest (FR);
**Philippe Marion**, Vernaison (FR);
**Damien Bourgeois**, Lyons (FR)

(73) Assignee: **Rhodia Polyamides Intermediates**,
Saint-Fons (FR)

( * ) Notice:　Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 60 days.

(21) Appl. No.: **10/353,912**

(22) Filed:　**Jan. 30, 2003**

(65)　　　**Prior Publication Data**

US 2004/0122251 A1　　Jun. 24, 2004

(30)　　**Foreign Application Priority Data**

Dec. 23, 2002　(FR) ................................... 02 16550

(51) **Int. Cl.**
*C07C 253/00*　　(2006.01)
(52) **U.S. Cl.** ...................... **558/335**; 558/332; 556/14;
502/162
(58) **Field of Classification Search** ................. 558/70,
558/348, 335, 332; 556/14; 502/162
See application file for complete search history.

(56)　　　　　**References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,512,696 A | * | 4/1996 | Kreutzer et al. ............ 558/338 |
| 5,959,135 A | * | 9/1999 | Garner et al. ............... 558/338 |
| 6,812,352 B1 | * | 11/2004 | Kreutzer et al. ............ 549/373 |
| 6,846,945 B1 | * | 1/2005 | Lenges et al. .............. 558/335 |

OTHER PUBLICATIONS

Campi et al. Aust. J. Chem, 1987,40,1053-61.*

* cited by examiner

*Primary Examiner*—Kamal A. Saeed
*Assistant Examiner*—Robert Shiao
(74) *Attorney, Agent, or Firm*—Buchanan Ingersoll, P.C.

(57)　　　　　**ABSTRACT**

The present invention relates to a process of hydrocyanation of ethylenically unsaturated organic compounds to compounds having at least one nitrile function, particularly the hydrocyanation of diolefins such as butadiene, or of substituted olefins such as alkene nitriles such as pentenenitriles; the subject hydrocyanation is carried out in the presence of a catalytic system comprising a metallic element and mono- and pluri-dentate organophosphorus ligands.

**23 Claims, No Drawings**

US 7,084,293 B2

1

## PROCESS OF SYNTHESIS OF COMPOUNDS HAVING NITRILE FUNCTIONS FROM ETHYLENICALLY UNSATURATED COMPOUNDS

### CROSS-REFERENCE TO PRIORITY APPLICATION

This application claims priority under 35 U.S.C. § 119 of FR-02/16550, filed Dec. 23, 2002, hereby expressly incorporated by reference.

### BACKGROUND OF THE INVENTION

1. Technical Field of the Invention

The present invention relates to a process of hydrocyanation of ethylenically unsaturated organic compounds to compounds having at least one nitrile function.

More particularly, it relates to the hydrocyanation of diolefins such as butadiene, or of substituted olefins such as alkene nitriles such as pentenenitriles.

2. Description of the Prior Art

French Patent No. 1,599,761 describes a process of preparation of nitrites by the addition of hydrocyanic acid to organic compounds having at least one ethylenic double bond, in the presence of a catalyst of nickel and a triaryl phosphite. This reaction can be performed with or without the presence of a solvent.

When a solvent is used in this prior art process, it is preferably a hydrocarbon such as benzene or the xylenes or a nitrile such as acetonitrile.

The catalyst used is an organic nickel complex containing ligands such as phosphines, arsines, stibines, phosphites, arsenites, or antimonites. The presence of a promoter to activate the catalyst, such as a boron compound or a metallic salt, generally a Lewis acid, is likewise already recommended in the said patent.

Much work has been carried out to find catalytic systems generally comprising an organophosphorus ligand and a catalytically active metal, more particularly nickel, and exhibiting higher and higher performances.

The performance of a catalytic system is evaluated by determining several characteristics such as, in particular, the stability of the catalytic activity of the system, the yield of the reaction, and the selectivity in the synthesis of advantageous products: in the present case, the selectivity for linear pentenenitriles or for adiponitrile.

Thus it was proposed at an earlier time to use as a catalytic system, nickel associated with organophosphorus ligands possessing a single phosphorus atom, termed monodentate ligands. The industrially used compound of this class of products is tritolyl phosphite (TTP). This system has very acceptable performance in the synthesis of pentenenitriles by the hydrocyanation of butadiene, but a performance in need of improvement for the synthesis of adiponitrile by hydrocyanation of pentenenitriles.

Furthermore, this catalytic system has good stability and solubility in the reaction medium. Such catalytic systems have been described in numerous patents such as, for example, U.S. Pat. No. 3,496,215, DE 19953058, FR 1,529, 134, FR 2,069,411, U.S. Pat. Nos. 3,631,191 and 3,766,231, FR 2,523,974.

To obtain catalytic performance, in particular high selectivity in the step of hydrocyanation of alkene nitriles, more particularly pentenenitriles, to dinitriles, a new class of organophosphorus ligands has been proposed, specifically intended to be associated with nickel. This new class of

2

ligands comprises organophosphorus compounds possessing several phosphorus atoms, termed pluridentate ligands. Among these, the proposed compounds are generally compounds including two phosphorus atoms, termed bidentate ligands.

Such compounds and catalytic systems are protected by numerous patents. By way of example, there can be mentioned WO 99/06355, WO 99/06356, WO 99/06357, WO 99/06358, WO 99/52632, WO 99/65506, WO 99/62855, U.S. Pat. No. 5,693,843, WO 96/11182, WO 96/22968, U.S. Pat. No. 5,981,772, WO 01/36429, WO 99/64155, and WO 02/13964.

The structure of these compounds is more or less complex, particularly as regards the groups carried by the phosphorus atoms and the structure connecting together the two phosphorus atoms.

With this class of bidentate ligands, it is possible to obtain a catalytic system having in particular a better selectivity in the production of linear dinitriles in the process of hydrocyanation of an alkene nitrile.

However, these bidentate ligands of more complex structure are more difficult to synthesize, making their cost higher. Consequently, it is necessary and important that their stability in the reaction medium is very high to permit utilization in an industrial process from an economic viewpoint. Furthermore, taking account of their complex structure, their solubility in the reaction medium can be reduced and can lead to a lowering of catalytic activity and thus of the total yield of the hydrocyanation reaction.

### SUMMARY OF THE INVENTION

One of the objects of the present invention is to propose a solution which permits catalytic systems based on pluridentate ligands to be used, specifically having the characteristics of elevated selectivity, while reducing the disadvantages linked to their instability and their level of solubility.

For this purpose, the invention proposes a process of hydrocyanation of compounds comprising at least one ethylenic unsaturation by reaction with hydrogen cyanide, in the presence of a catalytic system comprising a metallic element having catalytic activity associated with organophosphorus ligands chosen from the group comprising organophosphonites, organophosphinites, organophosphines, organophosphites, and organophosphoramides, characterized in that the catalytic system comprises at least two organophosphorus ligands, a first ligand chosen from the group of monodentate organophosphite compounds, and a second ligand chosen from the group of pluridentate organophosphorus ligands.

### DETAILED DESCRIPTION OF BEST MODE AND SPECIFIC/PREFERRED EMBODIMENTS OF THE INVENTION

According to a preferred characteristic of the invention, the ratio of number of moles of the second ligand expressed in phosphorus atoms to the number of atoms of the metallic element is at least equal to 1, and is preferably comprised between 1 and 6, advantageously comprised between 1 and 5 and more preferably comprised between 1 and 4.

According to another characteristic of the invention, the ratio of the total number of moles of organophosphorus ligands expressed in number of phosphorus atoms to the number of atoms of metallic element is comprised between 2 and 100. However, this ratio is not critical. "Total number

US 7,084,293 B2

3

of moles of organophosphorus ligands" is to be understood to mean the sum of moles of the first and second ligands

According to yet another preferred characteristic of the invention, the ratio of the number of moles of the first ligand and the number of moles of the second ligand is advantageously greater than 0.1, and more advantageously, greater than or equal to 0.5.

The organophosphorus ligands suitable as the first ligand are chosen from the group comprising monodentate organophosphite compounds such as the compounds of the following general formula (I)

(I)



in which $R_1$, $R_2$, and $R_3$, identical or different, represent a linear or branched alkyl radical having 1–12 carbon atoms and possibly including heteroatoms, an aromatic or cycloaliphatic radical, substituted or unsubstituted, which can include heteroatoms, and one or more rings of condensed form or not, with the radicals $R_1$, $R_2$, $R_3$, able to be connected together two by two.

As an example of monodentate organophosphite compounds suitable for the invention, there can be mentioned triphenylphosphite, tritolylphosphite, and trithymol phosphite.

Tritolylphosphite is the preferred compound, because it has good solubility in the reaction medium and is relatively inexpensive.

The organophosphorus compounds which are suitable for the second ligand are in particular the bidentate organophosphorated compounds of the following general formula II:



in which $R_1$, $R_2$, $R_3$, and $R_4$, identical or different, represent a linear or branched alkyl radical having 1–12 carbon atoms, which can include heteroatoms; an aromatic or cycloaliphatic radical, substituted or unsubstituted, which can include heteroatoms and one or more rings in condensed form or not; an alkylaryl radical; or an arylalkyl radical; where the radicals $R_1$ and $R_2$, and/or $R_3$ and $R_4$, can be connected together,

$X_1$, $X_2$, $X_3$, $X_4$, $X_5$, and $X_6$, identical or different, represent a covalent bond, an oxygen atom, or a divalent —$NR_5$— radical in which $R_5$ represents a hydrogen atom or an alkyl, aryl, sulfonyl, cycloalkyl, or carbonylated radical, and

L represents a covalent bond or a divalent linear alkyl radical having 1–12 carbon atoms, which can include heteroatoms; a divalent cycloaliphatic or aromatic radi-

4

cal, which can include heteroatoms, substituted or unsubstituted, able to include several rings in condensed form or not; a divalent alkylaryl or arylalkyl radical.

As examples of bidentate organophosphorus compounds, there can be cited the compounds described in the patents or patent applications cited hereinabove.

Likewise, there can be more particularly mentioned as second ligands the compounds exemplified in the following patents: WO 95/30680, WO 96/11182, WO 99/06358, WO 99/13983, WO 99/64155, WO 01/21579, and WO 01/21580.

The following structures are given by way of example, wherein Ph means phenyl.

US 7,084,293 B2

5

-continued



These compounds have a more complex structure than the first ligands described hereinabove and often have poor solubility in the reaction medium and greater instability. However, these second ligands, or bidentate ligands, have better catalytic properties, particularly as regards selectivity for nitriles or dinitriles.

According to the process of the invention, the use of a mixture of two ligands, monodentate and pluri (bi)dentate, enables the catalytic properties of the pluri (bi)dentate compound to be preserved, particularly as regards selectivity, while improving their stability in the reaction medium.

According to the invention, the catalytic system can be defined symbolically by the following general formula III:

$$M[L_1]_x[L_2]_y \qquad (III)$$

in which M represents a transition metal having catalytic activity; $L_1$ represents the monodentate organophosphorus first ligand; $L_2$ represents the pluridentate organophosphorus second ligand; x and y represent a decimal number corresponding to the number of moles of the respective ligand in the catalytic system.

According to a preferred characteristic of the invention, the metallic element M having catalytic activity is chosen from the group comprising nickel, cobalt, iron, ruthenium, rhodium, palladium, osmium, iridium, platinum, copper, silver, gold, zinc, cadmium and cerium.

This formula is given solely by way of indication and does not mean that each metal atom M is coordinated with the two ligands. Thus it is possible that a portion of the metal atoms M is coordinated solely with the first ligand, the other portion of the atoms with the second ligand, and finally, a last portion with the two ligands in variable proportions. The above formula has only been given as an indication and for clarity, and is based on the quantities of compounds used and not on a structural analysis of the catalytic system obtained.

The preparation of the organometallic complexes forming the above metallic system can be performed by placing in contact a solution of a compound of a chosen metal with a solution of each ligand (first or second) or a solution of these two ligands.

The metal compound can be dissolved in a solvent.

The metal can be present in the compound used either at the degree of oxidation which it will have in the organometallic complex, or at a higher degree of oxidation.

For example, it can be indicated that in the organometallic complexes of rhodium, rhodium is at the degree of oxidation (I), ruthenium at the degree of oxidation (II), platinum at the degree of oxidation (0), palladium at the degree of oxidation (0), osmium at the degree of oxidation (II), iridium at the degree of oxidation (I), nickel at the degree of oxidation (0).

If the metal is used at a higher degree of oxidation during the preparation of the organometallic complex, it can be reduced in situ.

Compounds of transition metals, more particularly compounds of nickel, palladium, iron, or copper, are preferably utilized as the transition metal.

Among the compounds mentioned hereinabove, the most preferable compounds are those of nickel.

As non-limitative examples, there can be mentioned: compounds in which nickel has degree of oxidation zero, such as potassium tetracyano nickelate, $K_4[Ni(CN)_4]$; bis(acrylonitrile) nickel zero; bis(1,5-cyclooctadiene nickel (likewise termed $Ni(cod)_2$), and derivatives containing ligands such as tetrakis (triphenylphosphine) nickel zero.

nickel compounds such as carboxylates (particularly acetate), carbonate, bicarbonate, borate, bromide, chloride, citrate, thiocyanate, cyanide, formate, hydroxide, hydrophosphite, phosphite, phosphate and derivatives, iodide, nitrate, sulfate, sulfite, aryl and alkyl sulfonates.

When the nickel compound used corresponds to a state of oxidation of nickel greater than zero, a nickel reducing agent is added to the reaction medium and preferentially reacts with nickel under the reaction conditions. This reducing agent can be organic or inorganic. As non-limitative examples, there may be mentioned borohydrides such as $NaBH_4$, $KBH_4$, Zn powder, magnesium, or hydrogen.

When the nickel compound used corresponds to the 0 oxidation state of nickel, a reducing agent of the abovementioned type can likewise be added, but this addition is not imperative.

When an iron compound is used, the same reducing agents are suitable.

In the case of palladium, the reducing agents can in addition be elements of the reaction medium (organophosphorated compound, solvent, olefin).

The solutions of the first and second ligands can be added simultaneously or successively. Furthermore, it is possible to prepare the organometallic complexes with each ligand separately, then to mix the two systems before introducing them into the reaction medium, or to introduce them directly into the said medium.

The organic compounds having at least one ethylenic double bond more particularly used in the present process are diolefins such as butadiene, isoprene, 1,5-hexadiene, 1,5-cyclooctadiene, ethylenically unsaturated aliphatic nitriles, particularly the linear pentenenitriles such as 3-pentenenitrile, 4-pentenenitrile; monoolefins such as styrene, methylstyrene, vinyl naphthalene, cyclohexene, methyl cyclohexene, and also mixtures of several of these compounds. The pentenenitriles can particularly contain amounts, generally minor, of other compounds, such as 2-methyl-3-butenenitrile, 2-methyl-2-butenenitrile, 2-pentenenitrile, valeronitrile, adiponitrile, 2-methylglutaronitrile, 2-ethylsuccinonitrile, or butadiene, arising for example from the prior hydrocyanation reaction of butadiene to unsaturated nitriles.

Indeed, during the hydrocyanation of butadiene, nonnegligible amounts of 2-methyl-3-butenenitrile and 2-methyl-2-butenenitrile are formed with the linear pentenenitriles. The catalytic system used for the hydrocyanation according to the process of the invention can be prepared before its introduction into the reaction zone, for example, by the addition, to mixtures of the first and second ligands

US 7,084,293 B2

7                                                    8

alone or dissolved in a solvent, of the appropriate quantity of the chosen transition metal compounds and possibly of the reducing agent, or according to the process described hereinabove. It is likewise possible to prepare the catalytic system "in situ" by the simple addition of the first and second ligands and of the transition metal compound to the hydrocyanation reaction medium, before or after the addition of the compound to undergo hydrocyanation.

The quantity of a nickel or other transition metal compound used is chosen to obtain a concentration, in moles of transition metal per mole of organic compounds to undergo hydrocyanation or isomerization, between $10^{-4}$ and 1, preferably between 0.0003 and 0.5 mole per mole of nickel or other transition metal used.

The total quantity of organophosphorus ligands used to form the catalyst is chosen such that the number of moles of these compounds with respect to one mole of transition metal is 0.5–500 and preferably 2–100.

Although the reaction is generally conducted without solvent, it can be advantageous to add an inert organic solvent. The solvent can be a solvent of the catalyst which is miscible at the hydrocyanation temperature with the phase including the compound to undergo hydrocyanation. As examples of such solvents, there can be mentioned aromatic, aliphatic, or cycloaliphatic hydrocarbons.

The hydrocyanation reaction is generally performed at temperature of 10° C. to 200° C. and preferably from 30° C. to 120° C. It can be performed in a medium possessing one phase or two phases.

The process of the invention can be carried out continuously or discontinuously.

The hydrogen cyanide used can be prepared from metallic cyanides, particularly sodium cyanide, or from cyanhydrins, such as acetone cyanhydrin, or by any other known process of synthesis.

The hydrogen cyanide is introduced into the reactor in gaseous or liquid form. It can also be dissolved beforehand in an organic solvent.

In the context of discontinuous performance, there can be charged into a reactor, purged beforehand with an inert gas (such as nitrogen, argon) either a solution containing the whole or a portion of the various constituents, such as the compound to undergo hydrocyanation, the compounds of formulas (I) and (II), the transition metal compound, the possible reducing agent and solvent; or the said constituents separately. The reactor is generally then brought to the chosen temperature. The hydrogen cyanide is then introduced, preferably in a continuous and regular manner.

When the reaction (the progress of which can be followed by assay of samples) has finished, the reaction mixture is withdrawn after cooling, and the reaction products are isolated, for example by distillation.

The process of hydrocyanation of ethylenically unsaturated compounds according to the present invention likewise relates to the hydrocyanation of the said ethylenically unsaturated nitriles obtained hereinabove by reaction with hydrogen cyanide, and consists of utilizing a catalytic system conforming to the present invention with a co-catalyst consisting of at least one Lewis acid.

The ethylenically unsaturated compounds which can be used in this step are generally those cited for the basic process. However, it is more particularly advantageous to apply it to the reaction of hydrocyanation to dinitriles of ethylenically unsaturated aliphatic nitriles, particularly to linear pentenenitriles such as 3-pentenenitrile, 4-pentenenitrile, and their mixtures.

These pentenenitriles can contain generally minor quantities of other compounds, such as 2-methyl-3-butenenitrile, 2-methyl-2-butenenitrile, 2-pentenenitrile, valeronitrile, adiponitrile, 2-methyl glutaronitrile, 2-ethyl succinonitrile, or butadiene, arising from the previous hydrocyanation reaction of butadiene and/or from the isomerization of 2-methyl-3-butenenitrile to pentenenitriles.

In the case of hydrocyanation of ethylenically unsaturated aliphatic nitriles, the Lewis acid used as co-catalyst particularly enables the linearity of the obtained dinitriles to be improved, that is, the percentage of linear dinitrile with respect to the total dinitriles formed, and/or the activity and lifetime of the catalyst to be increased.

By "Lewis acid" in the present text is intended the usual definition, namely, compounds which are electron pair acceptors.

In particular, the Lewis acids mentioned in the volume edited by G. A. Olah, "Friedel-Crafts and Related Reactions," Vol. 1, pages 191–197 (1963) can be used.

The Lewis acids which can be used as co-catalysts in the present process are chosen from among the compounds of elements of Groups Ib, IIb, IIIa, IIIb, IVa, IVb, Va, Vb, VIb, VIIb and VIII of the Periodic Table of the elements. These compounds are most often salts, particularly halides, such as chlorides or bromides; sulfates, halogenoalkyl sulfonates, or perhalogenoalkyl sulfonates, particularly fluoroalkyl sulfonates or perfluoroalkyl sulfonates, halogenoacetates, perhalogenoacetates, carboxylates, and phosphates.

As non-limitative examples of such Lewis acids, there can be mentioned zinc chloride, zinc bromide, zinc iodide, manganese chloride, manganese bromide, cadmium chloride, cadmium bromide, stannous chloride, stannous bromide, stannous sulfate, stannous tartrate, indium chloride, indium trifluoromethylsulfonate, indium trifluoroacetate, the chlorides or bromides of rare earth elements such as lanthanum, cerium, praseodymium, neodymium, samarium, europium, gadolinium, terbium, dysprosium, hafnium, erbium, thallium, ytterbium and lutetium, cobalt chloride, ferrous chloride, and yttrium chloride.

Compounds such as triphenylborane and titanium isopropylate can also be used as Lewis acids.

Mixtures of several Lewis acids can of course be used.

Among the Lewis acids there are more particularly preferred zinc chloride, zinc bromide, stannous chloride, stannous bromide, triphenylborane, indium trifluoromethylsulfonate, and zinc chloride/stannous chloride mixtures.

The Lewis acid co-catalyst used generally represents 0.01–50 moles per mole of transition metal compound, more particularly of nickel compound.

As in performing the basic process of the invention, the catalytic system used for hydrocyanation in the presence of a Lewis acid can be prepared before its introduction into the reaction zone, or in situ, for example by addition to the reaction zone of the different components of the catalytic system.

It is likewise possible, under the conditions of the hydrocyanation process of the present invention, and particularly operating in the presence of the previously described catalytic system comprising at least one monodentate ligand and a bidentate ligand and at least one transition metal compound, to perform, in the absence of hydrogen cyanide, the isomerization of 2-methyl-3-butenenitrile into pentenenitriles, and more generally, branched unsaturated nitrites into linear unsaturated nitrites.

The 2-methyl-3-butenenitrile subjected to isomerization according to the invention can be used alone or in a mixture with other compounds.

US 7,084,293 B2

9

Thus 2-methyl-3-butenenitrile can be used in a mixture with 2-methyl-2-butenenitrile, 4-pentenenitrile, 3-pentenenitrile, 2-pentenenitrile, butadiene, adiponitrile, 2-methyl glutaronitrile, 2-ethyl succinonitrile, or valeronitrile.

It is of particular interest to treat the reaction mixture from the hydrocyanation of butadiene with HCN in the presence of at least one mixture of compounds of formulae (I) and (II) and at least one transition metal compound, more preferably a nickel compound of degree of oxidation 0, as previously defined.

In the context of this preferred alternative, the catalytic system being already present for the hydrocyanation reaction of butadiene, it is sufficient to stop any introduction of hydrogen cyanide, to allow the isomerization reaction to proceed.

If need be, a slight flushing of the reactor with an inert gas such as nitrogen or argon can be performed in order to expel the hydrogen cyanide which could still be present.

The isomerization reaction is generally performed at a temperature of 10° C. to 200° C., and preferably from 60° C. to 180° C.

In the preferred case of isomerization immediately following the hydrocyanation reaction of butadiene, it will be advantageous to operate at the temperature at which the hydrocyanation was carried out.

As in the case of hydrocyanation of ethylenically unsaturated compounds, the catalytic system used for the isomerization can either be already present in the medium or prepared according to the fashion already described hereinabove.

Although the isomerization reaction is generally performed without solvent, it can be advantageous to add an inert organic solvent, which could be the solvent for the later extraction. This is particularly the case when such a solvent has been used in the butadiene hydrocyanation reaction, and serves to prepare the medium subjected to the isomerization reaction. Such solvents may be chosen from among those which have been mentioned hereinabove for hydrocyanation.

However, the preparation of dinitrile compounds by hydrocyanation of an olefin such as butadiene can be performed by using a catalytic system conforming to the invention for the above steps of formation of unsaturated nitrites and of isomerization; the hydrocyanation reaction of the unsaturated nitrites to dinitrites can be performed with a catalytic system according to the invention or any other catalytic system already known for this reaction.

Similarly, the olefin hydrocyanation reaction to unsaturated nitrites and the isomerization of the latter can be performed with a different catalytic system than that of the invention, the step of hydrocyanation of unsaturated nitrites to dinitriles being performed with a catalytic system according to the invention.

The following examples illustrate the invention.

In the examples, the abbreviations used have the meanings indicated below.

cod: 1,5-cyclooctadiene
eq: equivalent
3PN: 3-pentenenitrile
4PN: 4-pentenenitrile
3+4PN: 3PN+4PN
TT(Y): Transformation ratio of product Y to undergo hydrocyanation, corresponding to the ratio of the number of moles of Y transformed to the initial number of moles of Y.

10

Linearity (L): Ratio of the number of moles of adiponitrile (AdN) formed to the number of dinitriles formed (sum of moles of adiponitrile (AdN), ethylsuccinyl dinitrile (ESN), and methylglutaronitrile (MGN)).

Selectivity (%): Number of moles of AdN formed with respect to the theoretical number of moles of AdN, calculated from the number of moles of 3+4pn transformed.

CPG: gas phase chromatography
ml: milliliter
mol: mole
mmol: millimole
Ph: phenyl

EXAMPLES 1–12

These trials relate to the hydrocyanation of pentenenitriles to adiponitrile. These trials were performed according to four operating modes described hereinafter.

Operating Mode 1:

Under an inert atmosphere, there are charged successively into a 60-ml Schott glass tube equipped with a septum stopper:
the ligand (6 mole eq of ligand/Ni for monodentate ligands; 3 moles of ligand/Ni for bidentate ligands);
3-pentenenitrile (1.25 g, 400 eq/Ni);
bis(1,5-cyclooctadiene)₂ nickel (21 mg);
the Lewis acid (1 eq/Ni).

The reaction medium is heated to 70° C., with agitation. Acetone cyanhydrin is fed into the medium by a pressure syringe with a throughput of 0.45 ml per hour. After 3 hours of injection, the introduction of acetone cyanhydrin is stopped. The mixture is cooled to ambient temperature, diluted with acetone, and analyzed by gas phase chromatography.

Operating Mode 2:

Under an inert atmosphere, there are charged successively into a 60-ml Schott glass tube equipped with a septum stopper:
the bidentate ligand (1 mole eq of ligand/Ni);
the bidentate ligand (4 mole eq of ligand/Ni);
3-pentenenitrile (1.25 g, 400 eq/Ni);
bis(1,5-cyclooctadiene)₂ nickel (21 mg);
the Lewis acid (1 eq/Ni).

The reaction medium is then heated to 70° C. under agitation. Acetone cyanhydrin is fed into the medium by a pressure syringe with a throughput of 0.45 ml per hour. After 3 hours of injection, the introduction of acetone cyanhydrin is stopped. The mixture is cooled to ambient temperature, diluted with acetone, and analyzed by gas phase chromatography.

Operating Mode 3:

Under an inert atmosphere, there are successively charged into a 100 ml stainless steel reactor:
the ligand (6 mole eq of ligand/Ni for monodentate ligands; 3 eq mole of ligand/Ni for bidentate ligands);
3-pentenenitrile (30 g, 75 eq/Ni);
bis(1,5-cyclooctadiene)₂ nickel (1.30 g);
the Lewis acid (1 eq/Ni).

The reaction medium is then heated under agitation at 55° C. Liquid HCN is added to the reaction medium by a pressure syringe with a throughput of 1.92 ml per hour. After 5 hours of injection, the introduction of HCN is stopped. The mixture is cooled to ambient temperature, diluted with acetone, and analyzed by gas phase chromatography.

US 7,084,293 B2

11

12

Operating Mode 4:

Under an inert atmosphere, there are successively charged into a 100 ml stainless steel reactor:

the bidentate ligand (1 mole eq of ligand/Ni);

the monodentate ligand (4 mole eq of ligand/Ni);

3-pentenenitrile (30 g, 75 eq/Ni);

bis(1,5-cyclooctadiene)₂ nickel (1.30 g);

the Lewis acid (1 eq/Ni).

The reaction medium is then heated under agitation at 55° C. Liquid HCN is added to the reaction medium by a pressure syringe with a throughput of 1.92 ml per hour. After 5 hours of injection, the introduction of HCN is stopped. The mixture is cooled to ambient temperature, diluted with acetone, and analyzed by gas phase chromatography.

The results obtained are collected in Table 1 below:

TABLE 1

| Ex. | Ligand Used | Ratio L/Ni | Lewis Acid | Operating Mode | L(%) | Selectivity AdN(%) | Solubility |
|---|---|---|---|---|---|---|---|
| 1 | Ligand C | 6 | ZnCl₂ | 1 | 86 | 79 | Yes |
| 2 | Ligand C | 2 | ZnCl₂ | 1 | 83 | 73 | Yes |
| 3 | Ligand A | 6 | ZnCl₂ | 1 | 76 | 61 | Yes |
| 4 | Ligand C + A | 2–4 | ZnCl₂ | 1' | 84 | 82 | Yes |
| 5 | Ligand C | 6 | ZnCl₂ | 1 | 86 | 79 | Yes |
| 6 | Ligand C | 2 | ZnCl₂ | 1 | 83 | 73 | Yes |
| 7 | Ligand B | 6 | ZnCl₂ | 1 | 54 | 13 | Yes |
| 8 | Ligand C + B | 2–4 | ZnCl₂ | 1' | 83 | 74 | Yes |
| 9 | Ligand D | 6 | InTFA₃ | 2 | 92 | 81 | No |
| 10 | Ligand D | 2 | InTFA₃ | 2 | 74 | (1) | Yes |
| 11 | Ligand A | 6 | InTFA₃ | 2 | 81 | 75 | Yes |
| 12 | Ligand D + A | 2–4 | InTFA₃ | 2' | 92 | 81 | Yes |

(1) The selectivity could not be determined because the rate of transformation was too low.
InTFA₃: indium trifluoroacetate.

The L/Ni ratio is expressed in phosphorus atoms per nickel atom; the first ratio relates to the ratio of phosphorus atoms provided by the first ligand, and the second ratio relates to the phosphorus atoms provided by the first ligand.

ligand A: tritolyl phosphite.

ligand B: trithymol phosphite.

Ligand C:



Ligand D:



-continued



EXAMPLE 13

Hydrolysis of a mixture of ligands of the following formulas:



C

A



In a glove box, there are successively introduced into a 30 ml Schott type tube: ligand C (270 mg), ligand A (2 eq.), 3-pentenenitrile (1.0 g), and zinc chloride (2 eq). A clear, homogeneous mixture is obtained, which is agitated under an inert atmosphere and to which 2 eq of water are added. The composition of the mixture is then analyzed by ³¹P NMR.

The following results are obtained:

TABLE 2

| Time | Proportion of C, by Weight | Proportion of A, by weight |
|---|---|---|
| 15 minutes | 35% | 60% |
| 1 hour 40 minutes | 28% | 19% |
| 4 hours 30 minutes | 28% | 14% |

These results show the protection against hydrolysis of the bidentate ligands or second ligand, thus permitting

US 7,084,293 B2

13

economizing the more expensive ligand by reducing the rate of hydrolysis as well as the quantity of bidentate ligand with respect to metallic element, while conserving the level of catalytic activity of the system including the second ligand.

Each patent, patent application and literature article/report cited or indicated herein is hereby expressly incorporated by reference.

While the invention has been described in terms of various specific and preferred embodiments, the skilled artisan will appreciate that various modifications, substitutions, omissions, and changes may be made without departing from the spirit thereof. Accordingly, it is intended that the scope of the present invention be limited solely by the scope of the following claims, including equivalents thereof.

What is claimed is:

1. Process of hydrocyanation of compounds, wherein said compounds having at least one site of ethylenic unsaturation selected from the group consisting of diolefins and ethylenically unsaturated nitriles which comprises reacting said compounds with hydrogen cyanide in the presence of a catalyst having the general formula (III):

$$M[L_1]_x[L_2]_y \qquad (III)$$

wherein M is a catalytically active transition metal; $L_1$ is a monodentate organophosphorus first ligand; $L_2$ is a pluridentate organophosphorus second ligand; and x and y are each a decimal number corresponding to the number of moles of the respective ligand in the catalytic system.

2. Process according to claim 1, wherein the second organophosphorus ligand is a bidentate ligand.

3. Process according to claim 1, wherein the second ligand is selected from the group consisting of organophosphite, organophosphine, organophosphinite, organophosphonite, and organophosphoramide compounds.

4. Process according to claim 1, wherein the ratio of the number of second pluridentate ligands expressed in atoms of phosphorus to the number of atoms of metallic element is greater than 0.5.

5. Process according to claim 1, wherein the ratio of the total number of moles of first and second ligands, expressed as the number of moles of phosphorus atoms, to the number of atoms of metallic element, is comprised between 1 and 100.

6. Process according to claim 1, wherein the ratio of the total number of moles of first ligand to the number of moles of second ligand is greater than 0.1.

7. Process according to claim 1, wherein the first, monodentate ligand has the following general formula (I):

(I)

R₃    R₁
 \   /
  O  O
   \ /
    P
    |
    O
    |
    R₂

wherein $R_1$, $R_2$, and $R_3$, which may be identical or different, are each a linear or branched alkyl radical having 1–12 carbon atoms and optionally containing one or two oxygen atoms; an aromatic or cycloaliphatic radical, substituted or unsubstituted, also optionally containing one or two oxygen atoms; and one or two ring members, whether or not in condensed form, with the proviso that the radicals $R_1$, $R_2$, $R_3$ may be bonded together.

14

8. Process according to claim 7, wherein the second ligand has the general formula (II):

(II)

$$R_1 \quad\quad\quad R_3$$
$$| \quad\quad\quad\quad |$$
$$X_1 \quad\quad\quad X_3$$
$$| \quad\quad\quad\quad |$$
$$P-X_6-L-X_5-P$$
$$| \quad\quad\quad\quad |$$
$$X_2 \quad\quad\quad X_4$$
$$| \quad\quad\quad\quad |$$
$$R_2 \quad\quad\quad R_4$$

wherein $R_1$, $R_2$, $R_3$, and $R_4$, which may be identical or different, are each a linear or branched alkyl radical having 1–12 carbon atoms, optionally containing one or two oxygen atoms; an aromatic or cycloaliphatic radical, substituted or unsubstituted, also optionally containing one or two oxygen atoms and one or more ring members, whether or not in condensed form; an alkylaryl radical; or an arylalkyl radical; with the proviso that the radicals $R_1$ and $R_2$, and/or $R_3$ and $R_4$, can be bonded together; $X_1$, $X_2$, $X_3$, $X_4$, $X_5$, and $X_6$, which may be identical or different, are each a covalent bond, an oxygen atom, or a divalent $NR_5$ radical in which $R_5$ is a hydrogen atom or an alkyl, aryl, sulfonyl, cycloalkyl, or carbonylated radical, and L is a covalent bond or a divalent, linear alkyl radical having 1–12 carbon atoms, optionally containing one or two oxygen atoms; a divalent cycloaliphatic or aromatic radical, also optionally containing one or two oxygen atoms, substituted or unsubstituted, optionally including at least one ring member, whether or not in condensed form; or a divalent alkylaryl or arylalkyl radical.

9. Process according to claim 1, wherein the monodentate first ligand is selected from the group consisting of triphenyl phosphite, tritolyl phosphite, trithymol phosphite, and the bidentate second ligand is selected from the group consisting of the compounds of the following formulas:

US 7,084,293 B2

15

-continued



16

14. Process according to claim 1, wherein the compounds having at least one site of ethylenic unsaturation are selected from the group consisting of diolefins, butadiene, isoprene, 1,5-hexadiene, 1,5-cyclooctadiene, aliphatic nitriles having ethylenic unsaturation, linear pentenenitriles, pentene-3-nitrile, pentene-4-nitrile, and mixtures thereof.

15. Process according to claim 8, wherein the quantity of nickel or other transition metal compound employed is selected such that there are between $10^{-4}$ and 1 mole of nickel or other transition metal used per mole of organic compound to undergo hydrocyanation or isomerization, and the quantity of compound of formula (I) or formula (II) used is chosen such that the number of moles of this compound with respect to 1 mole of transition metal is 0.5–100.

16. Process according to claim 1, wherein the hydrocyanation reaction is performed at temperature of 10° C. to 200° C.

17. Process of hydrocyanation to dinitriles of ethylenically unsaturated nitriles, by reaction with hydrogen cyanide, performed in the presence of a catalyst according to claim 1 and a co-catalyst comprising at least one Lewis acid.

18. Process according to claim 17, wherein the ethylenically unsaturated nitriles are selected from the group consisting of ethylenically unsaturated aliphatic nitriles, linear pentenenitriles, pentene-3-nitrile, pentene-4-nitrile, and mixtures thereof.

19. Process according to claim 18, wherein the linear pentenenitriles contain quantities of other compounds selected from the group consisting of 2-methyl-3-butenenitrile, 2-methyl-2-butenenitrile, 2-pentenenitrile, valeronitrile, adiponitrile, 2-methyl glutaronitrile, 2-ethyl succinonitrile, or butadiene.

20. Process according to claim 17, wherein the Lewis acid co-catalyst is selected from the group consisting of compounds of elements of Groups Ib, IIb, IIIa, IIIb, IVa, IVb, Va, Vb, VIb, VIIb and VIII of the Periodic Table of the elements.

21. Process according to claim 17, wherein the Lewis acid is selected from the group consisting of halides, sulfates, halogenoalkyl sulfonates, perhalogenoalkyl sulfonates, halogenoacetates, perhalogenoacetates, carboxylates, and phosphates.

22. Process according to claim 17, wherein the Lewis acid is selected from the group consisting of zinc chloride, zinc bromide, zinc iodide, manganese chloride, manganese bromide, cadmium chloride, cadmium bromide, stannous chloride, stannous bromide, stannous sulfate, stannous tartrate, indium chloride, indium trifluoromethylsulfonate, indium trifluoroacetate, the chlorides or bromides of the rare earth elements lanthanum, cerium, praseodymium, neodymium, samarium, europium, gadolinium, terbium, dysprosium, hafnium, erbium, thallium, ytterbium and lutetium, cobalt chloride, ferrous chloride, and yttrium chloride, triphenylborane and titanium isopropylate, and mixtures thereof.

23. Process according to claim 17, wherein the Lewis acid used represents 0.01–50 moles per mole of transition metal compound.

10. Process according to claim 1, wherein the reaction is performed in a single-phase medium.

11. Process according to claim 1, wherein the transition metal is selected from the group consisting of nickel, cobalt, iron, ruthenium, rhodium, palladium, osmium, iridium, platinum, copper, silver, gold, zinc, cadmium, and mercury.

12. Process according to claim 1, wherein the reaction medium includes a solvent for the catalyst, miscible with the phase comprising the compound to undergo hydrocyanation at the temperature of hydrocyanation.

13. Process according to claim 1, wherein the transition metal is nickel and the catalyst is selected from the group consisting of compounds in which the nickel has a degree of oxidation as zero, potassium tetracyanonickelate K₄[Ni(CN)₄], bis(acrylonitrile) nickel zero, bis(1,5-cyclooctadiene) nickel, derivatives containing ligands, tetrakis (triphenylphosphine) nickel zero; nickel compounds, nickel carboxylates, carbonate, bicarbonate, borate, bromide, chloride, citrate, thiocyanate, cyanide, formate, hydroxide, hydrophosphite, phosphite, phosphate and derivatives, iodide, nitrate, sulfate, sulfite, aryl and alkyl sulfonates.

*   *   *   *   *

06-2180
RCL

**CIVIL COVER SHEET**

JS-44
(Rev.1/05 DC)

## I (a) PLAINTIFFS

INVISTA North America S.a.r.l. a Delaware Corporation

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF ___88888___
(EXCEPT IN U.S. PLAINTIFF CASES)

99999

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Abid R. Qureshi (202) 637-2240
Latham & Watkins LLP
555-11 St NW, Ste. 1000, Washington, DC

## DEFENDANTS

Rhodia Polyamide Intermediates S.A.S.

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT ___99999___
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT

CASE NUMBER   1:06CV02180

JUDGE: Royce C. Lamberth

DECK TYPE: General Civil

DATE STAMP: 12/22/2006

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☐ 2 U.S. Government
Defendant

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 4 Diversity
(Indicate Citizenship of Parties
in Item III)

## III CITIZENSHIP
FOR PLAINTIFF AND

|  | | | |
|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State ☐ 4 ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State ☐ 5 ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation ☐ 6 ☐ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**☐ A. Antitrust**

☐ 410 Antitrust

**☐ B. Personal Injury/**
**Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**☐ C. Administrative Agency**
**Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If
Administrative Agency is Involved)

**☐ D. Temporary Restraining**
**Order/Preliminary**
**Injunction**

Any nature of suit from any category may
be selected for this category of case
assignment.

*(If Antitrust, then A governs)*

**☒ E. General Civil (Other) OR ☐ F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☒ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or
defendant
☐ 871 IRS-Third Party 26
USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of
Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational
Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC
Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt
Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/
Exchange
☐ 875 Customer Challenge 12 USC
3410
☐ 900 Appeal of fee determination
under equal access to Justice
☐ 950 Constitutionality of State
Statutes
☐ 890 Other Statutory Actions (if not
administrative agency review or
Privacy Act

| | | | |
|---|---|---|---|
| □ G. *Habeas Corpus/ 2255*<br>□ 530 Habeas Corpus-General<br>□ 510 Motion/Vacate Sentence | □ H. *Employment Discrimination*<br>□ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br>*(If pro se, select this deck)* | □ I. *FOIA/PRIVACY ACT*<br>□ 895 Freedom of Information Act<br>□ 890 Other Statutory Actions (if Privacy Act)<br>*(If pro se, select this deck)* | □ J. *Student Loan*<br>□ 152 Recovery of Defaulted Student Loans (excluding veterans) |
| □ K. *Labor/ERISA (non-employment)*<br>□ 710 Fair Labor Standards Act<br>□ 720 Labor/Mgmt. Relations<br>□ 730 Labor/Mgmt. Reporting & Disclosure Act<br>□ 740 Labor Railway Act<br>□ 790 Other Labor Litigation<br>□ 791 Empl. Ret. Inc. Security Act | □ L. *Other Civil Rights (non-employment)*<br>□ 441 Voting (if not Voting Rights Act)<br>□ 443 Housing/Accommodations<br>□ 444 Welfare<br>□ 440 Other Civil Rights<br>□ 445 American w/Disabilities-Employment<br>□ 446 Americans w/Disabilities-Other | □ M. *Contract*<br>□ 110 Insurance<br>□ 120 Marine<br>□ 130 Miller Act<br>□ 140 Negotiable Instrument<br>□ 150 Recovery of Overpayment & Enforcement of Judgment<br>□ 153 Recovery of Overpayment of Veteran's Benefits<br>□ 160 Stockholder's Suits<br>□ 190 Other Contracts<br>□ 195 Contract Product Liability<br>□ 196 Franchise | □ N. *Three-Judge Court*<br>□ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

☒ 1 Original Proceeding □ 2 Removed from State Court □ 3 Remanded from Appellate Court □ 4 Reinstated or Reopened □ 5 Transferred from another district (specify) □ Multi district Litigation □ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
This is a civil action pursuant to 35 U.S.C. §256 to correct inventorship of U.S. Pat. No. 7,084,293. INVISTA also asserts claims for unjust enrichment, a constructive trust, (continued below)

**VII. REQUESTED IN COMPLAINT** CHECK IF THIS IS A CLASS □ ACTION UNDER F.R.C.P. 23 **DEMAND $** Check YES only if demanded in complaint **JURY DEMAND:** ☒ YES □ NO

**VIII. RELATED CASE(S) IF ANY** (See instruction) □ YES ☒ NO If yes, please complete related case form.

**DATE** 12/22/06 **SIGNATURE OF ATTORNEY OF RECORD** Ahnd R. Orsky

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I. COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI. CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

continued from VI. - misappropriation of trade secrets, and slander of title.